IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN ECK | : | |
| Plaintiff, | : | Civil Action No. |
| | : | |
| vs. | : | |
| | : | |
| ALAN WESTON; | : | |
| AMRINDER SINGH; | : | |
| DANIEL OLIVERI; | : | |
| in their Individual and Official | : | |
| capacities | : | |
| | : | |
| and | : | |
| | : | |
| UPPER DARBY TOWNSHIP | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

## COMPLAINT

### Summary of Civil Rights Claims for
### False Arrest, False Imprisonment and Malicious Prosecution

1.    This action is brought by Plaintiff, John Eck, ("Eck" or "John") to redress the Defendants' intentional violation of his Fourth Amendment right to be free from malicious prosecution and unreasonable seizure without probable cause.

2.    The facts are straightforward and undisputed.

3.    On July 31, 2024, Defendant, Alan Weston ("Weston"), emailed his supervisor, Amrinder Singh, that Weston overheard a private cell phone

conversation between his co-workers, John Eck and Jamie McGlaughlin, during which *McGlaughlin threatened* to "smack [Singh] in the back of his head and f*%k his shyt [*sic*] up." (*See* Weston's July 31, 2024 Email to Singh, **Exhibit "1."**) All three men worked at Upper Darby Township Department of Licenses and Inspections ("L&I").

4.      Singh forwarded Weston's July 31, 2024 email to Defendant police officer Daniel Oliveri on August 6, 2024. *See* **Exhibit "1."** But on August 8, 2024, Singh falsely told Oliveri that Eck (as opposed to McGlaughlin) threatened to have Singh assaulted if he attempted to conduct a ride along with Eck.

5.      On the same day, Defendant Weston falsely told Oliveri that Eck threatened to "crack [Singh] in the skull with a stick." *Id.*

6.      Oliveri had Weston's original email and necessarily knew that Weston accused McGlaughlin, not Eck, of threatening Singh.

7.      Oliveri knew that Singh and Weston were not credible. Nevertheless, Oliveri prepared an affidavit of probable cause for Mr. Eck's arrest falsely stating that Eck, not McGlaughlin, threatened to harm Singh.

8.      Worse, Oliveri recklessly and/or intentionally omitted Weston's original July 31, 2024 allegation (as contained in his email) from the Affidavit of Probable Cause, resulting in Plaintiff's false arrest and malicious prosecution.

## Jurisdiction and Jury Trial Demand

9.    Jurisdiction is conferred upon this court under 28 U.S.C. §§ 1331 and 1343(a)(3).

10.    Jurisdiction over the state law claims, if any, is based on the principles of supplemental jurisdiction, as codified at 28 U.S.C. § 1367.

11.    The amount in controversy far exceeds one hundred and fifty thousand dollars ($150,000).

12.    Mr. Eck demands trial by jury on all triable issues.

## Venue

13.    All actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania and involve Defendants who reside within the jurisdictional limits. Venue is accordingly invoked under 28 U.S.C. § 1391(b) and (c).

## Parties

14.    Plaintiff, John Eck, resides in Chester County, Pennsylvania.

15.    Defendant, Alan Weston, was at relevant times, employed at the Upper Darby Township L&I Department, with an office located at 100 Garrett Road Upper Darby, PA 19082, and acting under color of state law.

16.    Defendant, Amrinder Singh, was at all relevant times employed at the Upper Darby Township L&I Department as the Director of Licenses &

3

Inspections, Chief Building Official, and was acting under color of state law. Mr. Singh maintained an office located at 100 Garrett Road, Upper Darby, PA 19082. As the Director of Licenses & Inspections, Chief Building Official, Mr. Singh was a final policy making official.  Singh was acting under color of state law because, throughout this matter, he acted as Director, the so-called threat arose from his official ride-along policy, the report traveled exclusively through official Township channels, his August 8, 2024 statement was given in his capacity as the department head describing a threat against him in that role, and the special police response he received was available to him only because of his position.

17.    Defendant, Police Officer Daniel Oliveri, was at all relevant times employed by the Upper Darby Township Police Department and acting under color of state law.

18.    Defendant, Upper Darby Township, is a political subdivision and municipal entity subject to liability through the decisions of policy making officials such as Defendant, Amrinder Singh and Crandall Jones, one or both of whom directed, participated in, and/or ratified the unconstitutional conduct set forth below.

4

Facts

**A.    Alan Weston and Amrinder Singh Provide Knowingly False Information to Officer Oliveri.**

19.    All preceding paragraphs are realleged.

20.    On July 31, 2024, Defendant, Alan Weston ("Weston"), emailed his supervisor, Amrinder Singh, that Weston overheard a private cell phone conversation in the bathroom between his co-workers, John Eck and Jamie McGlaughlin. (*See* Weston's July 31, 2024 Email to Singh, **Exhibit "1."**)

21.    Weston's July 31, 2024 email stated, in part:

So I waited a few minutes and realized I had forgotten something in that very bathroom and went there and went in. A few seconds later **John [Eck] entered and said a few words and uttered** " yea, since he wants to go out with us and see what the F$%k I do, I got something for him". **Jaime [McGlaughlin] in return, says,** " yea, take him to 600 Cope st and let Darrin smack him in the back of his head and f*%k his shyt up " !!! They started laughing and said "yup, and nobody would know a damn thing , hahahahahah"

(*See* Weston's July 31, 2024 E-mail to Singh, **Exhibit "1."**)

22.    According to Weston, the Eck/McGlaughlin telephone conversation occurred in the men's bathroom, which Eck referred to as "The Spot" which was in the hallway outside of the License and Inspection Department. (*Id.*)

23.    Weston said that he knew that the men's bathroom was generally referred to as "The Spot."

24.    By necessity, restrooms are intended to be private spaces.

5

25.     On August 6, 2024, Defendant Singh forwarded Weston's email to Officer Oliveri. *See* **Exhibit "1."**

26.     Two days later, on August 8, 2024, Oliveri took Singh's recorded statement. In it, Singh stated that he recently implemented unpopular new policy and procedure that included "ride alongs" with employees to inspect their work. Singh stated that John Eck, while speaking with a third party on Eck's cellphone, threatened to assault Singh. *See* Affidavit of Probable Cause, **Exhibit "2."**

27.     Singh's recorded statement to Oliveri is a lie and directly contradicts the email that Singh received from Weston a week prior on July 31st.

28.     Oliveri also took Weston's recorded statement on August 8, 2024, the same day that Oliveri conducted Singh's recorded statement.

29.     Weston told Oliveri the following: "he [Weston] was in the bathroom across the hallway from License and Inspection office. After he was done he went back into the office and observed Eck on his cellphone" saying 'hold on let me get to the spot.' Weston stated he knows 'the spot' to be inside the men's room across from the License and Inspections office. Weston stated that he realized he forgot an item in the large stall in the men's room. While inside the large stall, he alleges he heard Eck enter the bathroom and could hear Eck on the phone with another License and Inspection employee whose

6

voice he can recognize. Weston stated that he heard Eck say "if he [] wants to come out with me, I will take him to 600 Copley and let him crack him in the skull with a stick." Weston stated he believed that Eck used a first name of someone with a "D" to commit the assault. *See* Affidavit of Probable Cause, **Exhibit "2."** This is precisely the same allegations Weston expressly attributed to McGlaughlin (not Eck) in the July 31st email that was provided to Officer Oliveri two days earlier.

30.   Oliveri prepared an incident report on August 8, 2024, identifying Singh as the victim. The report identifies three suspects: John Eck, Jamie McGlaughlin and Thomas Mahoney. But the report provided to Eck's criminal defense attorney is redacted relative to McGlaughlin and Mahoney.

31.   Oliveri prepared a supplemental report on August 27, 2024 stating he received a report "in reference to threats made by *numerous* L&I employees against the new L&I Director." [emphasis added].

32.   Oliveri prepared an Affidavit for Mr. Eck's arrest on August 28, 2024. The affidavit does not reference Weston's July 31, 2024 email accusing Jamie McGlaughlin of threatening Singh or the reattribution of the same threatening statement from McGlaughlin to Eck. The affidavit does not reference the other suspect, Thomas Mahoney.

33. The affidavit took the single threat that Weston's initial email clearly attributed to McGlaughlin and reattributed it to Eck, intentionally and/or recklessly in disregard for the obvious and exculpatory inconsistency.

34. Oliveri possessed Weston's July 31, 2024 email when he drafted the affidavit. Indeed, Oliveri had requested it: Singh's August 6, 2024 email transmitting the chain to Oliveri begins, "As requested, please see the email chain containing Al's [Weston] email." *See* **Exhibit "1."** Oliveri therefore knew, twenty-two days before creating the sworn affidavit, that the only contemporaneous or near contemporaneous account of the conversation attributed the threat of violence to McGlaughlin and attributed to Eck only a vague, non-violent remark.

35. Oliveri omitted from the affidavit any reference to the July 31, 2024 email, any reference to McGlaughlin's role as the speaker of the threat in Weston's original account, and any reference to the unexplained migration of the threat from McGlaughlin's mouth to Eck's.

36. No neutral magistrate reading a truthful and complete affidavit (i.e., one that disclosed that the affiant's sole eyewitness had attributed the operative threat to a different man in a written account made the same week as the alleged events) would have found probable cause to believe that Eck communicated a threat to commit a crime of violence with the intent to terrorize Singh.

37.    Furthermore, the affidavit's foundational assertion is chronologically impossible. The affidavit's first sentence states: "On Tuesday, July 16, 2024 this affiant took a report of threats from the victim in reference to an employee of Upper Darby Township making threats against him. The victim received the information from another party." *See* Affidavit of Probable Cause, **Exhibit "2."**  But the "another party" (Weston) did not report anything to anyone until July 31, 2024, when he sent his email to Singh.

38.    Moreover, Weston's email describes the overheard conversation as having occurred that same week as July 31, 2024, "[o]n Monday between 9:19 am and 10:00 am." *See* **Exhibit "1."**  July 16, 2024 was a Tuesday, more than two weeks earlier. On July 16, 2024, there was no accusation in existence for Singh to report: Weston had not yet allegedly overheard anything, had not yet written anything, and had not yet told anyone anything.

39.    Singh did not transmit Weston's email to Oliveri until August 6, 2024, and Oliveri did not take a statement from Singh until August 8, 2024. *See* **Exhibits "1" & "2."**

40.    The affidavit's assertion that Singh reported the threat to Oliveri on July 16, 2024 (two weeks before Weston's email existed) is false, and Oliveri knew or recklessly disregarded that it was false, because Oliveri possessed the dated email chain establishing the alleged sequence of events.

9

41.     The remaining charging documents compound the fabricated timeline. The Police Criminal Complaint and Oliveri's incident report identify the *offense* date as Thursday, August 8, 2024 at 11:42 a.m. August 8, 2024 at 11:42 a.m. is not the date or time of any alleged threat; it is the date and time Oliveri took the recorded statements of Singh and Weston at the police station.

42.     The Commonwealth thus charged Eck with committing a crime stemming from threatening statements the sole eyewitness initially and confidently attributed to a different person, on a date on which, by every account, nothing occurred.

43.     Accordingly, the sworn charging instruments place the victim's report two weeks before the accusation existed, place the offense on the day the police interviews occurred, and reattribute the central threatening statement to Eck without mentioning the fact it was initially attributed to McGlaughlin when first reported in writing. These are not clerical errors. They reflect an affidavit assembled without regard for, and in reckless disregard of, the documentary record in Oliveri's own possession.

44.     Based on Oliveri's knowingly and/or recklessly false Affidavit, a warrant for Eck's arrest was issued.

45.     Oliveri and two additional police officers arrested Mr. Eck at work on August 28, 2024. Mr. Eck was handcuffed, frisked and escorted out of his

office while his co-workers watched. It was a devastatingly embarrassing experience for Eck.

46. Officers later strip searched Eck and placed him in a holding cell for approximately 9 hours.

47. Eck suffered tremendously while kept in the holding cell, and for a significant portion of his holding period, Eck begged for medical attention due to his medical condition and/or his serious deterioration in mental health (he was ignored and none was provided).

48. For his part, McGlaughlin spoke to Oliveri only once, on August 28, 2024, the same day Eck was arrested. Oliveri audio taped McGlaughlin's interview. Oliveri asked him whether Eck made threatening remarks, which McGlaughlin emphatically denied. McGlaughlin voluntarily provided his cell phone to Oliveri for inspection.

49. McGlaughlin is still employed in the L&I department. He was never arrested or disciplined in connection with the above.

### B. Oliveri Never Discloses Weston's Email and he Never Amends or Supplements his Affidavit of Probable Cause to Include Exculpatory Evidence.

50. Upper Darby Township prosecuted Mr. Eck for nearly two years before he was acquitted at trial.

51. For nearly two years Eck was subject to demeaning supervision of Delaware County Court Bail Agency despite his obvious innocence. The Court

11

Bail Agency could arrest him at any time for failure to comply with his bail conditions, which prohibited from going on any Township property, contacting "the victims", precluded him from departing the state without permission of the Court and required him to report in person or by telephone as instructed.

52.   Over the course of nearly two years, Mr. Eck appeared in Court *9 times*, only to discover that the Commonwealth's witnesses did not appear or that it was otherwise unprepared.

53.   For nearly two years Mr. Eck lived with the anxiety that his reputation had been irreparably harmed, Defendants would make the same false accusations at trial, that he might be incarcerated, and that he might be subject to some other criminal penalty(ies) that would increase the devastation to his life.

54.   Despite having nearly two years, Oliveri never created a report disclosing his recorded interview of Jamie McGlaughlin in which McGlaughlin denied Eck threatened Singh.

55.   Likewise, Oliveri never raised or attempted to square Weston's original email accusing McGlaughlin with his later statements accusing Eck. In short, he never investigated this fundamental and/or plainly exculpatory inconsistency and never supplemented his report or affidavit.

56. Eck was originally charged with one count of terroristic threats. The District Attorney repeatedly offered to reduce the charge to harassment. But Eck was innocent and he repeatedly rejected any plea agreement.

57. A few days before his trial, the District Attorney offered to let Eck plea to a misdemeanor. But he again rejected the offer because he did not commit a crime.

58. Oliveri knowingly and/or recklessly concealed the exculpatory email.

59. Neither Oliveri nor the Commonwealth disclosed the email to Eck's criminal defense attorney until the day before trial.

60. As a direct result of his charge and/or arrest, Eck was terminated from his job at the L&I department on September 12, 2024. He lost his health benefits on September 30, 2024.[1] At the time of his termination, Eck was two years away from a vested pension he intended to secure.

---

[1] Plaintiff, who has a wife and two children, accepted the L&I position with the County primarily for stable and affordable medical benefit package. He and his wife both suffered from health conditions that required costly treatment, and his wife's doctors anticipated the need for surgery.

## Legal Claims

## Count I

### Section 1983 Claim for Violation of the Fourth Amendment
### False Arrest and False Imprisonment

61.    Plaintiff incorporates herein by reference all other paragraphs as if set forth fully at length herein.

62.    This claim is brought against all Defendants in their individual capacity.

63.    Plaintiff was acquitted of all criminal charges.

64.    Plaintiff was deprived of his liberty.

65.    There was no probable cause to arrest Plaintiff for making a terroristic threat under 18 Pa.C.S. § 2706(a)(1), "Communicat[ing], either directly or indirectly, a threat to: [. . .] commit any crime of violence *with intent* to terrorize another." [emphasis added].

66.    As Weston reported, Eck went to the bathroom to have a private conversation with McGlaughlin, during which allegedly threatening statements were made about Singh. However, this private conversation, as recited by Weston, does not evidence the communicating, directly or indirectly, of a threat to commit a crime of violence with the intent to terrorize another.

14

67. Setting aside Oliveri's reckless misstatements and omissions in his affidavit, any reasonably well-trained officer would know that the "facts" set forth in the affidavit, even if true, do not confer the *intent* to terrorize Singh.

68. When Oliveri's reckless omission of Weston's email and McGlaughlin's direct statements to Oliveri are added to the analysis, it is apparent that there was no probable cause for Eck's arrest as a matter of law.

69. As detailed herein, Oliveri knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for an arrest warrant and such statements or omissions are material or necessary to finding of probable cause. That is to say, the aforementioned false statements and omissions are things that a reasonable magistrate would want to know before determining whether probable cause existed for Eck's arrest.

## Count II

### Section 1983 Claim for Violation of the Fourth Amendment
### Malicious Prosecution

70. Plaintiff incorporates herein by reference all other paragraphs as if set forth fully at length herein.

71. This claim is brought against all Defendants in their individual capacity.

72.    Defendants initiated a criminal proceeding against Eck without probable cause.

73.    Plaintiff was arrested without probable cause and with malice, which may be inferred from lack of probable cause.

74.    Plaintiff was deprived of his liberty.

75.    The criminal charges terminated in Plaintiff's favor.

## Count III

### Section 1983 Claim Against Upper Darby Township for Municipal Liability

76.    Plaintiff incorporates herein by reference all other paragraphs as if set forth fully at length herein.

77.    Defendant Upper Darby Township acted through its final policymakers at every stage of the constitutional violations alleged herein.

78.    Crandall O. Jones is the Township's Chief Administrative Officer and, at all relevant times, was a final policymaking official for the Township with respect to Township administration and personnel.

79.    Weston's July 31, 2024 email was sent to Singh and copied to Jones. *See* **Exhibit "1."**

80.    Jones therefore possessed, from the first day of this matter, the contemporaneous or near contemporaneous written account attributing the threat of violence to McGlaughlin, not Eck. *See* **Exhibit "1."**

81.    Within approximately two hours of receiving Weston's email, at 4:03 p.m. on July 31, 2024, Jones personally forwarded it to Timothy Bernhardt, Superintendent of the Upper Darby Police Department, interrupting Bernhardt's vacation to do so. Jones wrote: "Given the circumstances we've discussed, I don't trust sharing this with anyone but you right now, but I'd like to take whatever action I can to engage on this before something happens. If you recommend someone, I'll reach out to them." *See* **Exhibit "1."**

82.    The law enforcement response to Weston's email was thus initiated, directed, and controlled from the top of Township government: by the Township's Chief Administrative Officer, communicating directly and exclusively with the Township's police Superintendent, in reliance on prior private discussions ("the circumstances we've discussed") and with an express intent to restrict who within the Township knew of the matter. *See* **Exhibit "1."**

83.    From July 31, 2024 forward, the Upper Darby Police Department (through its highest-ranking officer) possessed Weston's email attributing the threat to McGlaughlin.

84.    The Department possessed that exculpatory document before Oliveri opened an incident file, before Singh and Weston gave their August 8, 2024 recorded statements, and before Oliveri created his sworn affidavit omitting it.

17

85. On September 12, 2024, Jones (with actual knowledge of Weston's July 31, 2024 email and its attribution of the threat to McGlaughlin, and with actual knowledge that Eck had been arrested for the same threat) terminated Eck's employment.

86. Upon information and belief, Jones took no step at any time to correct the record, to cause the email's disclosure, or to question the basis for Eck's arrest, notwithstanding that he had personally possessed the exculpatory document since the day it was written.

87. By initiating and directing the police engagement, by permitting the prosecution to proceed on an accusation that the documents in his own possession contradicted, and by terminating Eck on the basis of that arrest and/or its associated charge, Jones and Singh (both policymakers) ratified the unconstitutional conduct of Defendants Oliveri, Singh, and Weston and the false factual basis on which it rested.

88. Jones and Singh acted deliberately; their decisions constituted official policy of Upper Darby Township, and their decisions were a moving force behind the violation of Eck's constitutional rights.

89. An official with policymaking authority can create official policy, by rendering a single decision and directly participating in an unconstitutional act.

90.   The Township failed to properly supervise its officers (including Oliveri), considering Timothy Bernhardt, Superintendent of the Upper Darby Police Department, personally received the July 31, 2024 email containing the exculpatory and contradictory information, and failed to train and/or supervise his subordinate Oliveri before the affidavit of probable cause was sworn and issued omitting said critical information.

91.   The Township further failed to properly supervise its officers (including Oliveri), considering the evidence plainly did not support a charge under 18 Pa.C.S. § 2706(a)(1) against Eck.

92.   Furthermore, Defendants Weston and Singh initiated Plaintiff's arrest by knowingly and falsely accusing Plaintiff of threatening Singh.

93.   Singh stated to Oliveri that he had policy making authority. Singh directly participated in Plaintiff's arrest and prosecution via his false statements to police.

94.   Upper Darby Chief Administrative Officer, Crandall O. Jones, terminated Plaintiff by letter dated September 12, 2024. Jones ratified Plaintiff's false arrest, malicious prosecution and ultimate termination.

## Prayer for Relief

Mr. Eck requests relief against Defendants as follows:

a. Declare that Defendants violated Mr. Eck's civil rights under 42 U.S.C. § 1983 to be free from unreasonable search and seizure and malicious prosecution;

b. Award compensatory damages in amounts to be determined at trial by the jury;

c. Award punitive damages against the individual defendants only in amounts to be determined at trial by the jury;

d. Award Mr. Eck costs and expenses related to the defense of his criminal prosecution;

e. Award Mr. Eck his back pay and front pay;

f. Award Mr. Eck his lost pension;

g. Award Mr. Eck costs, expenses and reasonable attorneys' fees related to the prosecution of this instant civil rights action;

h. Award Mr. Eck prejudgment interest; and

i. Award such further relief as is deemed appropriate.

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/Joseph P. Guzzardo, Esq.*
Joseph P. Guzzardo, Esq.
Counsel for Plaintiff
Guzzardo & Associates LLC

20

121 S. Broad Street,
Philadelphia, PA 19107
jguzzardo@guzzardolaw.com
215-718-6691